1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WATCHGUARD SECURITIES
LITIGATION,

This Document Relates to:    All Actions

Master File No. C05-678JLR

CLASS ACTION

ORDER

## I.   INTRODUCTION

This matter comes before the court on Defendants' second motion to dismiss (Dkt. # 60).  The court has reviewed the parties' briefing and supporting materials, and finds that further oral argument is unnecessary.  For the reasons stated below, the court GRANTS Defendants' motion and DISMISSES Plaintiffs' complaint with prejudice.

## II.   BACKGROUND & ANALYSIS

**A.   Summary of Prior Order and Proceedings**

The court's analysis in this order assumes familiarity with the court's April 2006 order dismissing Plaintiffs' original complaint (Dkt. # 54).  Where necessary, the court will repeat factual information and principles of law from the prior order, but will generally not repeat citations.

Plaintiffs brought this securities fraud action in the wake of WatchGuard's March 2005 restatement of its earnings for the first three quarters of 2004.  The restatement implicitly admitted errors in applying generally accepted account principles ("GAAP"), and explicitly admitted three types of errors:

ORDER – 1

1
2
3

> (i) inaccurate income statement classification of early pay incentive discounts taken by customers, (ii) under-accrual of customer rebate obligations, and (iii) timing of revenue recognition associated with specific products and services (resulting in an overstatement of product revenue and an understatement of deferred revenue).

4
5
6
7
8
9
10
11
12

Mar. 15, 2005 Form 8-K.  The restatement revealed not only that WatchGuard falsely stated its financial results for the first three quarters of 2004, but that the Sarbanes-Oxley certifications included in each of its quarterly statements were also false.  The certifications contained assurances that the stated financial results were adequate, and that the certifying officers had designed adequate financial controls, evaluated those controls, and disclosed any material weaknesses.  E.g., Nov. 9, 2004 Form 10-Q Exs. 31.1, 31.2.  In addition to false statements contained within WatchGuard's earnings reports, Plaintiffs also claimed falsity in a 2004 press release touting WatchGuard's "Firebox X" product.

13
14
15
16
17
18
19
20

False statements are an insufficient basis for a securities fraud claim.  This truism received substantial attention in the court's prior order dismissing Plaintiff's original complaint.  In a securities fraud action under Section 10(b) of the 1934 Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, culpability arises only when a defendant makes a false statement with scienter.  Scienter is the mental state encompassing the intent to deceive, mislead, or defraud.  It also encompasses deliberate recklessness – a degree of recklessness that strongly suggests actual intent.

21
22
23
24
25

At the pleading stage, a plaintiff must plead specific facts that create a strong inference of scienter.  See Nevius v. Read-Rite Corp. (In re Read-Rite Corp. Secs. Litig.), 335 F.3d 843, 848 (9th Cir. 2003) (noting that a mere "reasonable inference" of scienter does not satisfy the PSLRA).  A plaintiff's scienter-related allegations do not receive the

26
27
28

ORDER – 2

traditional deference afforded pleadings. The court must consider all inferences that arise from the plaintiff's allegations, not merely those that favor the plaintiff.[1]

The court dismissed Plaintiffs' original complaint because its allegations, taken as a whole, did not create a strong inference of scienter. The court repeatedly observed that Plaintiffs failed to allege facts supporting a strong inference that any Defendant acted culpably. Eg., Order at 21 (noting that Plaintiffs "offer little more than WatchGuard's restatement and their insistence that Defendants must have known of the accounting problems underlying the restatement"); see also Bielski v. Cabletron Sys., Inc. (In Re Cabletron Sys.), 311 F.3d 11, 31 (1st Cir. 2002) ("Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5.").

---

[1]Plaintiffs improperly use their opposition to the instant motion to move, *sub silentio*, for reconsideration of the court's prior order. In that order, the court set forth the applicable pleading standards. Order at 5-6. Plaintiffs' counsel ignores the order, providing a textbook example of what not to do when attempting to salvage a deficient complaint. Counsel states that "[n]either the PSLRA nor the Ninth Circuit has discarded the well-settled rule that 'allegations of material fact made in the complaint should be taken as true and construed in the light most favorable to the plaintiff.'" Opp'n at 4-5. Counsel's internal quotation is to Nursing Home Pension Fund, Local 144 ("NHPF") v. Oracle Corp., 380 F.3d 1226, 1229 (9th Cir. 2004). In NHPF, the court stated nearly the opposite of the proposition for which Plaintiffs' counsel cites it. The sentence from which counsel extracts the misleading quotation merely states the "general rule" for a motion under Fed. R. Civ. P. 12(b)(6). NHPF, 380 F.3d at 1229. The court further notes that for a complaint alleging securities fraud, the general rule gives way to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA. Id. at 1229-30. It notes in particular that the PSLRA requires a court to consider "all reasonable inferences" related to scienter, "whether or not favorable to the plaintiff." Id. at 1230. Plaintiffs repeat their misleading citation of NHPF later, adding another misleading citation. Opp'n at 16 (citing No. 84 Employer-Teamster Joint Council Pension Trust Fund ("EJCPTF") v. Am. West Holding Corp., 320 F.3d 920, 931 (9th Cir. 2003)). In EJCPTF, much as in NHPF, the court acknowledges the general rule for construing a complaint, and again notes that the general rule does not apply to allegations of scienter. EJCPTF, 320 F.3d at 931 (citing general rule); id. at 938 (noting that court must consider *all* inferences, favorable and unfavorable). Counsel's transparent misstatement of the law calls their legal scholarship into question (at best), and fails to advance their clients' cause.

ORDER – 3

1
2
3
4
5
6

Based on Plaintiffs' representation that their investigation had revealed additional information supporting new scienter-related allegations, the court granted Plaintiffs leave to amend their complaint.  Plaintiffs filed an amended complaint featuring allegations from four new unidentified witnesses ("UWs") in addition to new allegations from the UW named in the original complaint.  Defendants responded with the instant motion.

7

**B.      Review of New Allegations in Amended Complaint**

8
9
10
11
12
13
14
15
16

As to two of the alleged misstatements on which Plaintiffs base this action, the court need not revisit its discussion from the prior order.  First, the court found that Plaintiff's allegations regarding WatchGuard's erroneous classification of early pay incentive discounts fell short of creating a strong inference of scienter.  Order at 9-12.  The court finds no reason to revisit this finding after reviewing Plaintiffs amended complaint and their briefing.  The same is true of WatchGuard's early 2004 statement regarding the Firebox X product.  The court previously found no strong inference of scienter as to that statement, Order at 19-20, and reiterates that finding here.[2]

17
18
19
20
21
22
23
24

The court is therefore left to examine whether Plaintiffs' new allegations raise a strong inference of scienter as to misstatements regarding "under-accrual of customer rebate obligations," "timing of revenue recognition," as well as misstatements in WatchGuard's Sarbanes-Oxley certifications.  Although the court focuses on Plaintiffs' new allegations here, it considers their impact in light of all of Plaintiffs' allegations, including those the court reviewed in its prior order.  See Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001) (noting that a court must consider allegations "as a whole").

25
26
27
28

_____

[2]Plaintiffs' opposition brief is silent regarding the Firebox X statement, suggesting that they have abandoned their claim that the statement is actionable.

ORDER – 4

1

**1.      New Generalized Allegations**

Although most of Plaintiffs' new allegations pertain to specific WatchGuard

practices, some of them more generally address various Defendants' motive to mislead.

As was the case in its prior order, Order at 6-8, the court discusses these broader

allegations first.  Most of them are based on the knowledge of UW1, who worked as

Defendant (and former CFO) Michael McConnell's executive assistant until she[3] left the

company in July 2004.  ¶ 13.[4]  The court notes that Mr. McConnell ceased to serve as

WatchGuard's CFO in May 2004, and left WatchGuard in June 2004, nine months before

the end of the class period.  ¶ 13.

Some of UW1's allegations are so generalized as to be of trivial value in

strengthening the inference that Mr. McConnell acted with scienter.  Although she

describes Mr. McConnell as "very controlling" and "involved in everything," id., she

does not allege a single act of Mr. McConnell's that would illuminate his controlling

nature or its relevance in this lawsuit.  Similarly, her allegation that Mr. McConnell was a

"long-term associate[]" of the WatchGuard controller, ¶ 55, means next to nothing

without allegations explaining how his association with the controller implicates Mr.

McConnell.

UW1's other allegations are little more than innuendo, and speculative innuendo at

that.  She states that Mr. McConnell "kept two sets of financial books for WatchGuard,

which were referred to as the 'green books,'" and that he "kept these 'green books'

closely guarded."  ¶ 55.  Although UW1 has no knowledge of the green books' content,

Plaintiffs infer that their very existence is probative of scienter.  The court disagrees.

[3]Because the amended complaint does not reveal the gender of any UW, the court will use
feminine pronouns to refer to each UW.

[4]All citations using the bare "¶" symbol are to Plaintiffs' amended complaint.

ORDER – 5

In addition, UW1 asserts that, "at least during the period prior to the Class period," a former WatchGuard CEO who is not a Defendant exerted "such tremendous pressure" on Mr. McConnell that UW1 believes that "financial results may not have been legitimately derived," and that "even WatchGuard's board of directors became suspicious of how the results were being derived." ¶ 59. UW1 never explains which results she believes were illegitimate. This is a curious omission for two reasons: she admits that the alleged pressure occurred "prior to the Class period;" and she worked with Mr. McConnell from October 2003 until July 2004, a period that includes quarterly reports preceding the class period. Even if the court were to ignore UW1's vagueness as to what time period's results were not "legitimately derived," it cannot ignore that the allegations come without a shred of support. Although UW1 allegedly "assisted in the preparation of Board of Director and Audit Committee meetings, including preparing the minutes of those meetings," ¶ 59, she offers no indication of what she observed or learned in that role. If UW1 learned information to substantiate her bare allegations that the company reported "illegitimate" financial results and that the board was suspicious of those results, the court would expect to see such allegations in the amended complaint. Without such allegations, UW1's assertions are worth little in strengthening an inference of scienter.

The remaining generalized allegations in the amended complaint are also not compelling. Plaintiffs assert that many of the Defendants' offices were located, along with other executive offices, in the same corner of the same floor of WatchGuard's corporate headquarters. ¶ 17. Several of the Defendants attended quarterly "numbers meetings" where they discussed WatchGuard's finances. ¶ 18. There is no allegation that anything nefarious occurred at these meetings. Indeed, there are no specific allegations whatsoever as to what occurred at these meetings. In addition, Defendant Steven Moore "interacted directly even with mid to lower-level [sic] employees and took

the time to know them by name." ¶ 12.  Mr. Moore invited unspecified employees to his

home for "social gatherings."  Id.  Despite these allegations, there are no allegations that

any employee communicated anything relevant to this lawsuit to Mr. Moore.  Finally,

Plaintiffs allege that several Defendants were certified public accountants with advanced

degrees.  Although these allegations raise an inference that various Defendants *could*

have had incriminating knowledge, they are silent as to whether any Defendant had

incriminating knowledge (or was deliberately reckless) with respect to the false

statements at issue.  The court thus finds the allegations to be of marginal value in

strengthening an inference of scienter.

### 2.    Allegations Regarding Revenue Recognition and Rebate Obligations

In restating its 2004 financial results, WatchGuard admitted that unspecified errors

pertaining to "under-accrual of customer rebate obligations" and "timing of revenue

recognition associated with specific products and services" required it to reduce its

revenue over the first three quarters of 2004 by a total of approximately $1.8 million,

with a corresponding cumulative increase in quarterly losses.

In Plaintiffs' view, these errors arose from WatchGuard's aggressive attempts to

convince customers to make orders at the end of quarters, its failure to account for

knowledge that its customers would return a large percentage of certain products, its

failure to promptly process returned product, and its failure to properly manage accounts

receivable in light of these concerns.  These assertions of "channel stuffing"[5] and other

---

[5]"Channel stuffing" is the term for the practice of flooding customers with products to
increase revenues.  "Channel stuffing" is merely good business when the customers want or keep
the products they receive; it is bad business when the customers do not want the products and
return them.  See Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 598 (7th Cir. 2006)
(describing channel stuffing); see also Bielski v. Cabletron Sys., Inc. (In Re Cabletron Sys.), 311
F.3d 11, 34-35 (1st Cir. 2002) ("Techniques that result in early booking of sales, such as channel
stuffing, might prove to be entirely legitimate, depending on the specific facts.").

ORDER – 7

improprieties, based largely on new information from four UWs, form the bulk of the new allegations in Plaintiffs' amended complaint.  None of the UWs, however, have any information regarding any Defendant's role in, or awareness of, these issues.

### a.   UW2's allegations

UW2, a former national accounts manager at WatchGuard, was the sole UW featured in Plaintiffs' original complaint.  Plaintiffs have expanded on UW2's allegations regarding WatchGuard's processing of returned products.  She alleges that WatchGuard had a practice of allowing returned products to accumulate in its warehouses without completing the processing that would allow WatchGuard's records to reflect their return. ¶ 68.  In August 2004, WatchGuard conducted a "pre-audit" of its return processing systems.  Id.  After the pre-audit, an unnamed person or persons asked UW to assess the systems.  Id.  She discovered various problems that delayed return processing.  ¶¶ 69-70, 77.  WatchGuard recorded processed returns on an "RMA log," which existed on a shared computer system.  ¶ 70.  WatchGuard used information from the RMA log to ensure that sales of returned products were not erroneously recorded as revenue.  ¶ 71.  In her assessment, UW2 discovered "hundreds of thousands of dollars" of unprocessed returns, some of which were nearly a year old when she began her assessment in fall 2004.  ¶ 72.  As was the case in the original complaint, there are no allegations explaining when UW2 completed her assessment, to whom she reported the results, or the actions WatchGuard took in response.

UW2 also provides information regarding WatchGuard's end-of-quarter sales practices.  She alleges that it was common for WatchGuard sales representatives to request that customers place end-of-quarter orders "for more than needed" and to provide generous rights of return on the products sold.  ¶ 56.  She estimates that as much as 85% of WatchGuard's end-of-quarter sales resulted in returns.  ¶ 57.

ORDER – 8

In what will become a familiar refrain, the court notes that UW2 does not allege that any Defendant was culpably aware of the problems she describes. Although UW2 reported to a manager who reported to a vice president who reported to CEO (and Defendant) Edward Borey, ¶ 56 n.2, there are no allegations that reveal whether she communicated any information up the chain of command, or whether any information traveled down the chain of command from Mr. Borey to her. There are no allegations that UW2 communicated in any way with Mr. Borey or another Defendant, or that UW2 has knowledge of any relevant communications with a Defendant. Although UW2 states that WatchGuard required "senior management" approval for returns of more than $10,000 in product, ¶ 70, there is no indication that Defendants became aware of excessive returns via this policy, much less that any Defendant was aware that WatchGuard was not adequately accounting for the returns.

### b.    UW3's allegations

UW3 was a purchasing specialist at WatchGuard. According to her, WatchGuard experienced significant problems with its "Vclass" products due to their "premature release" in 2002, two years before the class period began. ¶ 61. Those problems continued until the end of 2004. Id. She states that an unspecified WatchGuard CEO[6] directed the premature release because he wanted to match a competitor's release of a similar product. Id. UW3 alleges that WatchGuard's customers returned an "extreme" number of Vclass products.[7] ¶ 62. She estimates that customers returned as many as half of the Vclass products that WatchGuard shipped, and that they were still returning as

_____

[6]Unique among the UWs on which Plaintiffs rely, UW3 identifies questionable conduct by an executive officer at WatchGuard. Unfortunately, the conduct occurred two years before the class period, and the executive officer is not a Defendant in this action.

[7]According to UW2, WatchGuard lost a major customer during the Class Period because of performance problems with Vclass products. ¶ 66.

ORDER – 9

many as a fifth of those products in "May/June 2004."  ¶ 63.  UW3 had responsibility for managing WatchGuard's system for estimating customer orders.  She states that as the company's product offerings grew in number, the company did not assign additional employees to assist her.  ¶¶ 64-65.  UW3 stated that WatchGuard would not accept product returns in the final week of a quarter, and noted various problems that would delay the processing of product returns.  ¶¶ 73-74.  According to UW3, WatchGuard auditors had long questioned the company's returns processing practices, and became "far more adamant about it in August or September 2004."  ¶ 78.  Like UW2, UW3 alleges that WatchGuard returns went unprocessed for long periods of time.  ¶ 74 (noting delays of "as long as 45 days from the time when the goods had been received at the warehouse").

UW3 also alleges that "end-of-quarter 'games' and 'suspicious' end-of-quarter discounts were commonplace at WatchGuard," ¶ 73, although she provides no corroborating allegations.

As with the other UWs, UW3 does not allege that any Defendant was culpably aware of the problems she describes.  UW3 reported to a to a vice president who reported to Mr. Borey, ¶ 61, but there are no allegations regarding communication of any information up or down the chain of command between Mr. Borey and UW3.  For example, UW3 claims that she "asked [her supervising vice-president] on several occasions why the Company was not timely processing sales returns or properly crediting customer accounts."  ¶ 75.  The vice-president's response – "Sales needs to get their acts together" – suggests that he placed the blame on WatchGuard's sales representatives.  Id. More importantly, the vice-president's response does not suggest that he reported the problems to a Defendant.  There are no allegations that UW3 communicated directly or indirectly with Mr. Borey or another Defendant.  There are also no allegations that UW3

ORDER – 10

has knowledge of any relevant communication involving any Defendant.  For example, although UW3 states that "warehouse personnel would complain about unprocessed returns," she does not state that anyone communicated these complaints to a Defendant.

### c.  UW4's allegations

UW4 was a WatchGuard sales representative.  She reported to a director who reported to a vice president who reported to Defendant and CEO Ed Borey.  ¶ 58.  She alleges that she experienced "intense pressure" to ship WatchGuard products at the ends of quarters, although she does not reveal who pressured her.  Id.  She also states that sales representatives entered "side-agreements" extending discounts and other incentives to customers, and that the company began to pressure representatives to document such arrangements.  ¶ 88.  Like UW2 and UW3, she identifies several deficiencies in WatchGuard's return processing practices.  ¶¶ 79-82.  She alleges that those deficiencies led to difficulties in calculating WatchGuard's accounts receivable.  ¶¶ 81-83.

Like all other UWs on which Plaintiffs rely, UW4 does not allege that any Defendant was aware of the problems she describes.  She does not allege that she has any knowledge regarding any Defendant.

### d.  UW5's allegations

Finally, UW5, a WatchGuard credit and collections analyst, confirms that WatchGuard had difficulty managing its accounts receivable.  ¶¶ 83-87.  She blames WatchGuard's delayed and otherwise improper recording of product returns for those difficulties.  She alleges that WatchGuard failed to write off uncollectible receivables.  ¶ 89.  Aside from the problem with returns, WatchGuard's promotion and rebate programs made it difficult for the company to properly record revenue.  ¶ 96.  Consistent with UW4's allegations, she states that she often discovered improper "side-agreements" that sales personnel made with customers that violated company policy.  ¶ 87.  She

ORDER – 11

believed that WatchGuard's accounts receivable were "clearly overstated" during the class period.  ¶ 90.

Again, UW5's allegations are silent as to the knowledge or conduct of any Defendant.  For example, she alleges that "throughout [her] tenure [she] had thought that all of WatchGuard's revenue recognition was 'crooked' and that there 'were things [WatchGuard] shouldn't have done.'"  ¶ 87.  She does not allege, however, that she communicated her suspicions of "crooked" practices to anyone, nor that she has any basis for assigning culpability for the "crooked" practices to any Defendant.  The same is true of her concerns regarding accounts receivable.  UW5 reported to a manager who reported to a WatchGuard CFO[8], but she does not allege any relevant communications up or down her chain of command.  ¶ 87.

## C.   The New Allegations Do Not Create a Strong Inference that Any Defendant Made a False Statement With Scienter.

The court must now decide whether the new allegations, considered along with the allegations the court reviewed in its prior order, create a strong inference of scienter.

The allegations from the UWs create a strong inference that WatchGuard had significant problems in several areas.  The allegations suggest that WatchGuard's end-of-quarter scramble to make sales, including the extension of generous rebates and rights of returns, caused several difficulties.  First, the uncertainty as to whether products would be returned, or what rebates a customer might claim, made it difficult to properly calculate the company's accounts receivable.  Second, when customers returned products, WatchGuard did not process the returns quickly, leading to delayed recognition of the reduced revenue associated with product returns.

_____

[8]The amended complaint is silent as to which CFO UW5's manager reported to, and as to whether that CFO is a Defendant.

ORDER – 12

1    As Defendants note, however, it is not clear that the problems that the UWs

2    describe are the problems that led WatchGuard to restate its results.  The restatement

3    admitted three categories of error.  WatchGuard's mis-classification of early pay

4    incentive discounts as interest expense is plainly unrelated to the problems that the UWs

5    describe.  Defendants also assert that the problems are not related to the other two

6    categories of error:  "under-accrual of customer rebate obligations" and the "timing of

7    revenue recognition associated with specific products and services."  The court declines

8    to resolve this dispute.  It suffices to note that sales representatives' aggressive practices

9    with respect to rebates and other sales incentives could lead to an "under-accrual of

10   customer rebate obligations," and that delays in processing returns and difficulty

11   calculating accounts receivable could lead to problems with the "timing of revenue

12   recognition."  The court assumes for purposes of the instant motion that the UWs have

13   identified problems that were at least a partial cause of WatchGuard's restated earnings.

14   

15   Plaintiffs rely on three theories to transform the ground-level problems that they

16   and their UWs describe into a strong inference that any Defendant acted with scienter.

17   First, they argue that there is a strong inference that one or more Defendants knew about

18   the ground-level problems, knew that they likely made WatchGuard's quarterly financial

19   results false, but announced the quarterly results nonetheless.  Second, Plaintiffs argue

20   that if Defendants did not know of the ground-level problems, this was due to their

21   deliberate recklessness in avoiding awareness of the problems.  Third, Plaintiffs argue

22   that if Defendants did not know about the ground-level problems, it was because

23   WatchGuard's financial controls were inadequate.  In that case, Plaintiffs necessarily

24   focus on Defendants' certifications of those controls under the Sarbanes-Oxley act, and

25   argue that there is strong inference that Defendants either knew of or were deliberately

26   

27   

28   

ORDER – 13

reckless regarding the adequacy of the financial controls.  The court addresses each theory in turn.

**1.      Plaintiffs Fail to Raise a Strong Inference that Any Defendant Knew of WatchGuard's Ground-Level Problems, or that Any Defendant Knew that Those Problems Made WatchGuard's Financial Results False.**

As the court has noted in describing the UWs' allegations, Plaintiffs raise no direct inference that a Defendant was culpably aware of the problems that the UWs describe. The allegations suggest that the UWs, some of WatchGuard's sales personnel, and even WatchGuard's warehouse personnel were aware of the problems.  The amended complaint, however, is conspicuously devoid of specific allegations regarding any Defendant's knowledge.  Although each of the UWs was one or two "direct reports" away from a Defendant, there is no indication that any Defendant acquired any UWs' (or anyone else's) knowledge of WatchGuard's ground-level problems.[9]  It is not enough to describe "channel stuffing" and other improprieties.  Plaintiffs must establish that a Defendant is culpable in those practices.  For example, in one case on which Plaintiffs rely, the court dismissed a claim based on "channel stuffing" as to one defendant because plaintiffs could not establish his culpability.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 604 (7th Cir. 2006).  The court permitted such allegations to proceed against another defendant because plaintiffs alleged that he "'worked directly with [the company's] sales personnel' to effect the channel stuffing."  Id. at 604-605.  Such allegations are missing from Plaintiffs' amended complaint.

---

[9]UW4 states that there was "a disconnect" even between WatchGuard's warehouse personnel and the employees who handled customer accounts.  ¶ 79.  This supports an inference that the information necessary to identify defects in WatchGuard's returns processing did not flow freely.

ORDER – 14

At best, Plaintiffs' allegations raise an inference that the problems were sufficiently serious, chronic, and important to WatchGuard that the Defendants must have known about them.  This is not a strong inference, however, for several reasons.

First, WatchGuard consistently disclosed that product returns and rebates could negatively impact its revenues.  In every quarterly report at issue in this action, WatchGuard has disclosed that its revenue statements depend on estimated allowances for returns and rebates.  E.g., Nov. 9, 2004 Form 10-Q at 6.  It warned that "*[p]roduct returns, retroactive price adjustments and rebates could exceed our allowances, which could adversely affect our operating results*."  Id. at 31.  The company acknowledged that it could "experience significant returns, price adjustments and rebate costs for which we may not have adequate allowances."  Id.  It explained that despite its efforts to accurately forecast returns and other allowances, those provisions could be inadequate.  Id.  WatchGuard also disclosed that "the efforts of [its] sales force to meet or exceed quarterly and year-end quotas" meant that the company "received a substantial portion of a quarter's sales orders and earned a substantial portion of a quarter's revenues during the quarter's last month and the latter half of the last month."  Id. at 31-32.

In light of these disclosures, Plaintiffs cannot argue that Defendants failed to disclose the *potential* deleterious impact of its end-of-quarter sales pushes and its returns and rebates practices.  Plaintiffs' allegations must support a strong inference that a Defendant was aware of (or recklessly indifferent to) *actual* errors resulting from those practices that rendered WatchGuard's quarterly numbers inaccurate or unreliable.

To the extent Plaintiffs' allegations address the subject at all, they reveal that WatchGuard took corporate-level actions to address problems it discovered in its ground-level practices.  Plaintiffs make much of the allegation that in August 2004, WatchGuard failed a "pre-audit" of its systems for processing product returns.  Importantly, this "pre-

ORDER – 15

audit" occurred when WatchGuard had already issued two of the three quarterly reports that are the subject of this action. Assuming that one or more Defendants were aware of the pre-audit and informed of its results, there is no evidence to support Plaintiffs' allegation that Defendants "[d]eliberately ignor[ed]" the problems. Opp'n at 3. Instead, the reasonable inference is that Defendants were acting appropriately to identify problems. Indeed, WatchGuard's quarterly report for the third quarter of 2004, the first such report after the "pre-audit" that Plaintiffs describe, included a new disclosure relating to the auditors' activities. WatchGuard acknowledged that the Sarbanes-Oxley Act would require it, for the first time, to furnish a year-end report regarding the effectiveness of its internal controls, and that the company's auditors would have to certify the report. Nov. 9, 2004 Form 10-Q at 28. It stated that the company had begun to review its internal controls, but had not completed that review. Id. The company acknowledged that it could not guarantee that the evaluation would not reveal inadequate controls. Id. Disclosing its auditors' activities to the investing public and admitting that the auditors might discover material inadequacies in WatchGuard's financial controls is hardly consistent with an intent to mislead investors.

Moreover, after discovering problems in the pre-audit, WatchGuard took other corrective measures. Someone assigned UW2 to assess WatchGuard's processing of returned products. If UW2 discovered problems, reported them directly or indirectly to a Defendant, and WatchGuard took no corrective action, the court would expect to see such allegations in the amended complaint. If, as UW3 alleges, auditors became "far more adamant" about WatchGuard's returns processing systems after the August pre-audit, the court would expect to see allegations that one or more Defendants perpetuated the faulty practices despite the auditors' adamance. Such allegations are missing from the complaint. Instead, the allegation is that WatchGuard assigned auditors and employees to

ORDER – 16

investigate its returns processing systems.  These allegations are far more consistent with an attempt to remedy problems than with an intent to mislead investors.

In addition to efforts to reform its return processing systems, UW4's allegations show that WatchGuard attempted to address problems arising from "side-agreements" with customers.  She states that beginning in 2005, the company required sales personnel to document all discounts in each transaction's purchase order and invoice.  ¶ 88.  This provides strong support for the inference that WatchGuard attempted to redress the problems that UW4 identifies.  It provides little to no support for the inference that a Defendant acted with intent to mislead investors.

The inference that the court takes from the Plaintiffs' allegations and the timing of WatchGuard's public disclosures is that WatchGuard discovered problems and acted appropriately to remedy them.  When a pre-audit revealed problems, it acted to investigate those problems.  When the investigation of those problems revealed errors in its previous financial reporting, it restated its financial results.  These same inferences make the inference that Defendants were deliberately misstating financial results too weak to meet Plaintiffs' burden to establish a strong inference of scienter.

> **2.    Plaintiffs Fail to Raise a Strong Inference that Any Defendant Was Deliberately Reckless With Respect to the Problems Underlying the Inaccurate Quarterly Reports.**

Even if Defendants did not know of the ground-level problems that made WatchGuard's quarterly financial results inaccurate, Plaintiffs could succeed by raising a strong inference of deliberate recklessness.  As the court discussed in the previous section, however, this inference is weak in light of allegations that show that WatchGuard investigated its problems and acted to remedy them.

Unable to offer specific allegations of reckless conduct, Plaintiffs fall back to unsupported accusations.  They assert, for example, that "WatchGuard's accounting

ORDER – 17

irregularities were so obvious and widely known within the 300-employee Company,
[sic] that even the most cursory review of the books would have led to the discovery of
the false information." Opp'n at 8.[10]  This allegation is inconsistent with the accounts of
Plaintiffs' own witnesses, who do not allege any problem that would have been apparent
from a "cursory review of the books."  The books, for example, would not reveal
unprocessed product returns.  The books would not reveal the extent to which apparently
complete sales were subject to rights of return, rebates, or other revenue-reducing
incentives.  Instead, according to the UWs, those problems would become apparent upon
an investigation of WatchGuard's ground-level sales and returns processing practices.
According to the UWs, WatchGuard undertook such an investigation.

### 3. Plaintiffs Fail to Raise a Strong Inference that Defendants Had Knowledge of or Were Recklessly Indifferent to the Adequacy of WatchGuard's Financial Controls.

Unable to raise a strong inference that any Defendant acted culpably in misstating
WatchGuard's quarterly financial results, Plaintiffs must show that the Sarbanes-Oxley
certifications accompanying those results were culpably false.  The court's discussion of
the certifications in its prior order is equally applicable to Plaintiffs' amended complaint.
Order at 15-18.  In light of the new allegations, however, the court must consider whether
the existence of the problems that the UWs identify raises a strong inference that at least
one Defendant made a culpably false statement about WatchGuard's financial controls.

The court assumes for present purposes that better "controls" would have revealed
the ground-level problems at issue.  This assumption is not without controversy.
Although WatchGuard admitted to material weaknesses in its controls when it issued the
March 2005 restatement, it did not reveal which controls were inadequate.  Under these

---

[10]Plaintiffs follow this sweeping statement with a decidedly unhelpful citation to 101 of the
187 paragraphs of the amended complaint.  Opp'n at 8 (citing ¶¶ 47-147).

circumstances, t is not obvious what "controls" would have ameliorated the problems that Plaintiffs identify.  It appears that Defendants should have had better awareness of the sales practices and returns processing practices at issue, but there is no indication that "controls" would have provided that awareness.  The court shelves those concerns, however, and assumes that better controls would have, at the very least, led WatchGuard to discover these problems sooner.

Even under the assumption that WatchGuard's misstated earnings are the result of shoddy controls, the court finds no strong inference of scienter as to Defendants' inaccurate Sarbanes-Oxley certifications.  For many of the reasons that the court has already discussed, there are no allegations that create a strong inference that Defendants knew WatchGuard's controls were inadequate, or were deliberately reckless regarding those controls.  Plaintiffs' allegations suggest that WatchGuard took steps to assess its controls during the class period, and acted to improve its controls when it discovered those problems.  They do not raise a strong inference that any Defendant acted culpably in designing those controls, assessing them, or certifying them under the Sarbanes-Oxley Act.  That the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim.

### III.   CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion to dismiss with prejudice (Dkt. # 60).  Plaintiffs have failed to create the strong inference of scienter necessary to salvage their principal claim for securities fraud, and their claim for control person liability fails as a result.  See Order at 21.  In deciding the instant motion, the court has relied solely on the amended complaint and documents incorporated in the amended complaint by reference.  The court therefore DENIES Defendants' request for judicial notice (Dkt. # 61).

ORDER – 19

Plaintiffs' briefing concludes with a pro forma request for leave to amend their complaint, Opp'n at 24, but Plaintiffs provide no reason for the court to grant the request. The court must grant leave to amend if it finds that an amendment to the complaint could cure the deficiencies that led to its dismissal.  See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.").  In this case, the court is convinced that Plaintiffs cannot salvage their complaint with an amendment.  In its prior order, the court acknowledged the apparent problems at WatchGuard, and directed Plaintiffs to provide evidence that would culpably link a Defendant to those problems.  Plaintiffs responded with new allegations that provided more detail about the problems, but provided virtually no new allegations about the culpable conduct of any Defendant.  Plaintiffs give the court no reason to believe that they could cure this deficiency if granted leave to amend.  See Gompper v. VISX, Inc., 298 F.3d 893, 898 (9th Cir. 2002).

DATED this 12th day of October, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 20